# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| US BANK, N.A., | ) |
| | ) |
| Plaintiff, | ) |
| | ) 3:15-cv-00241-RCJ-WGC |
| vs. | ) |
| | ) **ORDER** |
| SFR INVESTMENTS POOL 1, LLC et al., | ) |
| | ) |
| Defendants. | ) |

This case arises out of a completed homeowners' association ("HOA") foreclosure sale and an impending HOA foreclosure sale of the same property by a different HOA. Pending before the Court are two Motions to Dismiss the Complaint (ECF Nos. 24, 27), a Motion to Dismiss the Counterclaim (ECF No. 42), and a Motion for a Preliminary Injunction (ECF No. 46). For the reasons given herein, the Court denies the motions to dismiss the Complaint, grants the motion to dismiss the Counterclaim, with leave to amend, and consolidates the motion for a preliminary junction with a trial on the merits of Plaintiff's second claim.

## I.      FACTS AND PROCEDURAL HISTORY

Plaintiff US Bank, N.A. became the successor beneficiary of a $236,000 promissory note and first deed of trust encumbering real property at 2546 Napoli Dr., Sparks, NV 89434 (the "Property") on October 7, 2013. (Compl. ¶¶ 2, 6–19, ECF No. 1). On June 6, 2013, Defendants

had conducted a non-judicial HOA foreclosure sale of the Property at which Defendant SFR Investments Pool 1, LLC ("SFR") purchased the Property for $9,000. (*Id.* ¶¶ 31–32).  Prior to the sale, however, counsel for Plaintiff's predecessor-in-interest had tendered the $288 super-priority amount of the HOA lien to Defendant Alessi & Koenig, LLC ("Alessi"), counsel for Defendant D'Andrea HOA, but Alessi had rejected the tender. (*Id.* ¶¶ 24–30).

Plaintiff sued SFR, D'Andrea HOA, Alessi, Siena HOA, and The Clarkson Law Group, P.C. ("Clarkson") for: (1) quiet title (SFR, D'Andrea HOA, and Siena HOA); (2) a preliminary injunction (SFR, Siena HOA, and Clarkson); (3) wrongful foreclosure (D'Andrea HOA and Alessi); (4) Negligence (D'Andrea HOA and Alessi); (5) Negligence Per Se (D'Andrea HOA and Alessi); (6) Breach of Contract (D'Andrea HOA and Alessi); (7) Misrepresentation (D'Andrea HOA); (8) Unjust Enrichment (SFR, D'Andrea HOA, and Alessi); and (9) Breach of the Covenant of Good Faith and Fair Dealing (D'Andrea HOA and Alessi).  SFR answered and filed a Counterclaim for declaratory relief that the June 6, 2013 foreclosure sale at which it purchased the Property extinguished US Bank's deed of trust against the Property under Nevada Revised Statutes section ("NRS") 116.3116.  Clarkson has moved to dismiss the single claim against it in the Complaint for a preliminary injunction.  Siena HOA has separately moved to dismiss the quiet title and preliminary injunction claims for failure to state a claim.  US Bank has moved to dismiss the Counterclaim and has moved for a preliminary injunction preventing Siena HOA and its agents (including Clarkson) from conducting a sale of the Property.

## II.   LEGAL STANDARDS

### A.   Dismissal for Failure to State a Claim

Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief" in order to "give the defendant fair notice of

what the . . . claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957). Federal Rule of Civil Procedure 12(b)(6) mandates that a court dismiss a cause of action that fails to state a claim upon which relief can be granted. A motion to dismiss under Rule 12(b)(6) tests the complaint's sufficiency. *See N. Star Int'l v. Ariz. Corp. Comm'n*, 720 F.2d 578, 581 (9th Cir. 1983). When considering a motion to dismiss under Rule 12(b)(6) for failure to state a claim, dismissal is appropriate only when the complaint does not give the defendant fair notice of a legally cognizable claim and the grounds on which it rests. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). In considering whether the complaint is sufficient to state a claim, the court will take all material allegations as true and construe them in the light most favorable to the plaintiff. *See NL Indus., Inc. v. Kaplan*, 792 F.2d 896, 898 (9th Cir. 1986). The court, however, is not required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences. *See Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).

A formulaic recitation of a cause of action with conclusory allegations is not sufficient; a plaintiff must plead facts pertaining to his own case making a violation "plausible," not just "possible." *Ashcroft v. Iqbal*, 556 U.S. 662, 677–79 (2009) (citing *Twombly*, 550 U.S. at 556) ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."). That is, under the modern interpretation of Rule 8(a), a plaintiff must not only specify or imply a cognizable legal theory (*Conley* review), but also must allege the facts of his case so that the court can determine whether the plaintiff has any basis for relief under the legal theory he has specified or implied (assuming the facts are as he alleges (*Twombly-Iqbal* review). Put differently, *Conley* only required a plaintiff to identify a major premise (a legal theory) and

conclude liability therefrom, but *Twombly-Iqbal* requires a plaintiff additionally to allege minor premises (facts of the plaintiff's case) such that the syllogism showing liability is logically complete and that liability necessarily, not only possibly, follows (assuming the allegations are true).

"Generally, a district court may not consider any material beyond the pleadings in ruling on a Rule 12(b)(6) motion. However, material which is properly submitted as part of the complaint may be considered on a motion to dismiss." *Hal Roach Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d 1542, 1555 n.19 (9th Cir. 1990) (citation omitted). Similarly, "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading, may be considered in ruling on a Rule 12(b)(6) motion to dismiss" without converting the motion to dismiss into a motion for summary judgment. *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994). Moreover, under Federal Rule of Evidence 201, a court may take judicial notice of "matters of public record." *Mack v. S. Bay Beer Distribs., Inc.*, 798 F.2d 1279, 1282 (9th Cir. 1986). Otherwise, if the district court considers materials outside of the pleadings, the motion to dismiss is converted into a motion for summary judgment. *See Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 925 (9th Cir. 2001).

## B.     Preliminary Injunction

The Court of Appeals in the past set forth two alternative sets of criteria for determining whether to grant preliminary injunctive relief:

> Under the traditional test, a plaintiff must show: (1) a strong likelihood of success on the merits, (2) the possibility of irreparable injury to plaintiff if preliminary relief is not granted, (3) a balance of hardships favoring the plaintiff, and (4) advancement of the public interest (in certain cases). The alternative test requires that a plaintiff demonstrate either a combination of probable success on the merits and the possibility of irreparable injury or that serious questions are raised and the

balance of hardships tips sharply in his favor.  These two formulations represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases.  They are not separate tests but rather outer reaches of a single continuum.

*Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S. Dep't of Agric.*, 415 F.3d 1078, 1092–93 (9th Cir. 2005) (quoting *Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1120 (9th Cir. 2005)) (citations and internal quotation marks omitted).  The Supreme Court later ruled, however, that a plaintiff seeking an injunction must demonstrate that irreparable harm is "likely," not just possible. *Winter v. NRDC*, 555 U.S. 7, 19–23 (2008) (rejecting the Court of Appeals' alternative "sliding scale" test insofar as it permitted an injunction based on a probability of irreparable harm that is less than "likely").  The Court of Appeals has recognized that the "possibility" test was "definitively refuted" in *Winter*, and that "[t]he proper legal standard for preliminary injunctive relief requires a party to demonstrate 'that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'" *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1127 (9th Cir. 2009) (quoting *Winter*, 129 S. Ct. at 374) (reversing a district court's use of the Court of Appeals' pre-*Winter*, "sliding-scale" standard and remanding for application of the proper standard).

A Court of Appeals ruling relying largely on the dissenting opinion in *Winter* parsed the language of *Winter* and subsequent Court of Appeals rulings and determined that the sliding scale test remained viable when there was a lesser showing of likelihood of success on the merits amounting to "serious questions," but not when there is a lesser showing of likelihood of irreparable harm. *See Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134 (9th Cir. 2011).  This case presents some difficulty in light of *Winter* and prior Court of Appeals cases. To the extent *Cottrell*'s interpretation of *Winter* is inconsistent with *Selecky*, *Selecky* controls.

*See Miller v. Gammie*, 335 F.3d 889, 899 (9th Cir. 2003) (en banc) (holding that, in the absence of an intervening Supreme Court decision, only the en banc court may overrule a decision by a three-judge panel).  The Supreme Court stated in *Winter* that "[a] plaintiff seeking a preliminary injunction must establish that he is *likely* to succeed on the merits, that he is *likely* to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, *and* that an injunction is in the public interest." *Winter*, 555 U.S. at 20 (citing *Munaf v. Geren*, 128 S. Ct. 2207, 2218–19 (2008); *Amoco Prod. Co. v. Gambell*, 480 U.S. 531, 542 (1987); *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 311–12 (1982)) (emphases added).  The test is presented as a four-part conjunctive test, not as a four-factor balancing test, and the word "likely" modifies the success-on-the-merits prong in exactly the same way it separately modifies the irreparable-harm prong.  In rejecting the sliding-scale test as to the irreparable-injury prong of the test, the *Winter* Court emphasized the fact that the word "likely" modifies the irreparable-injury prong. *See id.* at 22.  The word "likely" modifies the success-on-the-merits prong the same way. *See id.* at 20.

In summary, to satisfy *Winter*, a movant must show that he is "likely" to succeed on the merits.  According to a layman's dictionary, "likely" means "having a high probability of occurring or being true." Merriam–Webster Dictionary, http://www.merriam-webster.com/dictionary/likely.  Black's defines the "likelihood-of-success-on-the-merits test" more leniently as "[t]he rule that a litigant who seeks [preliminary relief] must show a reasonable probability of success . . . ." Black's Law Dictionary 1012 (9th ed. 2009).  The Court must reconcile the cases by interpreting the Cottrell "serious questions" requirement to be in harmony with the *Winter*/*Selecky* "likelihood" standard, not as being in competition with it.  "Serious questions going to the merits" must therefore mean that there is at least a reasonable probability of success

on the merits.  "Reasonable probability" appears to be the most lenient position on the sliding

scale that can satisfy the requirement that the chance of success be "likely."

### III.    ANALYSIS

#### A.    The Motions to Dismiss the Complaint

Clarkson notes that a preliminary injunction is not a separate cause of action but a

remedy.  But although Plaintiff appears to seek a preliminary injunction in the Complaint (and

has separately sought one via the present motion), the claim can also fairly be perceived as

requesting permanent injunctive relief under 28 U.S.C. § 2202 based on a favorable ruling on the

first cause of action under § 2201.  Such a claim for "further relief" attendant to a potential

declaration under § 2201 is appropriate.  Clarkson also argues, however, that it is not a proper

party to the Complaint at all because it is simply alleged to have recorded a Notice of Delinquent

Assessment Lien ("NDAL") on behalf of Siena HOA[1] and to have provided a payoff demand to

Plaintiff when requested. (*See* Compl. ¶¶ 33–35).  Plaintiff alleges that the payoff demand

indicates that Clarkson will not accept funds for the payoff of only the superpriority amount. (*Id.*

¶ 35).[2]  Siena HOA notes in its own motion to dismiss that it merely caused Clarkson to record a

NDAL as to the Property in September 2014, but there has been no foreclosure sale, nor has any

notice of sale ("NOS") been recorded.  It therefore asks the Court to dismiss the quiet title claim

because there is no ripe dispute over title to the property as between Siena HOA and Plaintiff.

---

1 It appears that one HOA sale has occurred and a second is impending: the first in June 2013 by
Alessi on behalf of D'Andrea HOA, and a second by Clarkson on behalf of Siena HOA.  This
implies that SFR has defaulted on HOA fees to Siena HOA after buying the Property at
D'Andrea HOA's sale, and also that D'Andrea HOA or Siena HOA is a sub-HOA of the other.

2 That's not true.  As Clarkson notes, the payoff demand attached to the Complaint itself makes
clear that the full amount demanded would be necessary to stop the foreclosure, but that lesser
payments would be accepted without any warranty or representation as to the legal effect of
lesser payments. (*See id.*, Ex. 17).  The letter is not inconsistent with the ability of Plaintiff to
make a payment in an amount it believes sufficient to protect the first mortgage.

1     The Court agrees there will be no ripe quiet title controversy as between Siena HOA,

2     Clarkson, and Plaintiff unless and until Siena HOA causes Clarkson to conduct a foreclosure sale

3     that could affect Plaintiff's lien.  There is a ripe quiet title claim against D'Andrea HOA, Alessi,

4     and SFR based on the 2013 foreclosure, of course.  As to the 2013 foreclosure, Plaintiff alleges

5     D'Andrea HOA's agent, Alessi, wrongfully rejected tender of the superpriority amount before

6     selling the Property to SFR.  But Clarkson, like Siena HOA, is not alleged to have had anything

7     to do with the 2013 foreclosure.  Still, the Court can fairly interpret Plaintiff's claim against

8     Siena HOA and Clarkson as a claim for a declaration of the superpriority amount of Siena

9     HOA's current lien under NRS 116.3116 and for potential further relief. *See* 28 U.S.C. § 2201,

10    2202.  Siena HOA has recorded the NDAL such that Plaintiff must now pay the superpriority

11    amount to Siena HOA or its agent before the impending foreclosure in order to protect its own

12    lien.  There is a ripe controversy over the correct superpriority amount, because Clarkson has

13    allegedly refused to identify that amount despite a request by Plaintiff.  Rather, Clarkson has

14    responded essentially that Plaintiff can take its chances by paying a lesser amount than the full

15    HOA lien if it wishes.  Forcing Plaintiff to make such a choice makes the controversy over the

16    superpriority amount ripe for a declaratory judgment.

17        **B.    The Motion to Dismiss the Counterclaim**

18        US Bank argues against SFR's Counterclaim on five bases: (1) NRS 116.3116 *et seq.* are

19    unconstitutional under the Due Process Clause for lack of notice; (2) NRS 116.3116 is

20    unconstitutional under the Takings Clause; (3) the interpretation of NRS 116.3116 by the Nevada

21    Supreme Court in *SFR Invs. Pool I, LLC v. U.S. Bank, N.A.*, 334 P.3d 408 (Nev. 2014) is

22    contrary to public policy; (4) the sale was commercially unreasonable under Nevada law; and (5)

23    *SFR Invs. Pool I, LLC* should be applied only prospectively, i.e., only to HOA foreclosures

24

occurring after the announcement of that opinion.  SFR has not timely responded even within the two-week extension of time granted.  This is enough to grant the motion. *See* Local R. 7-2(d). However, the Court will address the motion on the merits, as well.

> 1. **Public Policy**

A federal court must honor state law in diversity cases, *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938), as authoritatively interpreted by the state's own courts, *Comm'r v. Estate of Bosch*, 387 U.S. 456, 465 (1967) (citing *id.*).  A federal court may not under *Erie* countermand a state court's authoritative interpretation of a state statute based upon the federal court's own sense of public policy under state law.  A state's own public policy is inherent in its statutes and the authoritative judicial opinions interpreting them.  A pronouncement by a federal court that a state's own public policy requires a different interpretation or application of a statute than the state's highest court has given it would run afoul of *Erie*, because a state's highest court presumably considers public policy when it interprets state statutes and implicitly rejects any public policy arguments against the interpretation it adopts.  Only if a state supreme court were to announce a public policy in a later case after having previously interpreted a statute would it arguably be appropriate for a federal court sitting in diversity to anticipate that the state supreme court would alter its previous interpretation of the statute based on its later pronouncement of the state's public policy.  US Bank does not allege such a pattern of events.

On the other hand, a federal court may strike down a state statute under the "substantive due process" component of the Due Process Clause of the Fourteenth Amendment where a law deprives a person of a right to life, liberty, or property that a court in its "reasoned judgment" believes is "fundamental," even if the proffered right is not specifically listed in the Constitution, so long as the right can be perceived from history, tradition, or "new insight." *Obergefell v.*

1    *Hodges*, --- S. Ct. ----, 2015 WL 2473451, at *11, 20 (2015) (liberty interest) ("[T]he

2    Constitution contemplates that democracy is the appropriate process for change, so long as that

3    process does not abridge fundamental rights.  [But] when the rights of persons are violated, the

4    Constitution requires redress by the courts, notwithstanding the more general value of

5    democratic decisionmaking." (citations and internal quotation marks omitted)); *see also Lochner*

6    *v. New York*, 198 U.S. 45, 56–57 (1905) (liberty and property interests) ("This is not a question

7    of substituting the judgment of the court for that of the legislature. . . . It is a question of which of

8    two powers or rights shall prevail, the power of the state to legislate or the right of the individual

9    to liberty of person and freedom of contract.").  A court should only exercise its reasoned

10   judgment to invalidate a democratically enacted law in the absence of any clear constitutional

11   requirement to do so after there has been "a quite extensive discussion" concerning the right at

12   issue in the halls of government and amongst the general public. *Obergefell*, 2015 WL 2473451,

13   at *9.

14          The doctrine of substantive due process is the closest thing of which the Court is aware to

15   a federal judicial power to strike down a state law based on a federal court's own notions of good

16   policy.  US Bank has not made a substantive due process argument, but *Obergefell* was decided

17   after the present motion was filed, and the theory of substantive due process reinvigorated

18   therein had been long discredited before that opinion was announced.  Normally, the Court

19   would permit US Bank to make such an argument in a subsequent motion to dismiss if it wished

20   to do so, because the defense was not available when US Bank filed the present motion, *see* Fed.

21   R. Civ. P. 12(g)(2), but the issue is moot because the Court dismisses the Counterclaim for

22   another reason, *see infra*, with leave to amend.  US Bank may attack any amended complaint on

23

24

1   the bases noted here and may amend the Complaint to plead a substantive due process theory if it

2   wishes.

3           **2.      Prospective Application of the Statute**

4           US Bank argues that *SFR Investments Pool I*'s interpretation of NRS 116.3116 should not

5   apply retroactively, i.e., that it should only apply to HOA foreclosure sales occurring after the

6   date *SFR Invs. Pool I, LLC* was decided.  The Court is compelled to reject the argument under

7   *Erie*.  The *SFR Investments Pool I* Court itself applied NRS 116.3116 retroactively in the way

8   US Bank argues against.  The HOA foreclosure sale had already occurred in that case, as well,

9   and the Nevada Supreme Court gave no indication that its ruling was not to apply in the case

10  before it but only to future HOA foreclosure sales.

11          **3.      The Takings Clause**

12          Both the United States and Nevada Constitutions prohibit the taking of private property

13  by a governmental entity for public use without just compensation. *See* U.S. Const. amend V,

14  Nev. Const. art. I, § 8, cl. 6.  When the government destroys a lien under state law and itself

15  receives the value of the destroyed lien, there is a Fifth Amendment taking, even if the lien

16  remains technically valid but unenforceable because of the United States' sovereign immunity:

17                  The total destruction by the Government of all value of these liens, which
18          constitute compensable property, has every possible element of a Fifth
            Amendment "taking" and is not a mere "consequential incidence" of a valid
19          regulatory measure.  Before the liens were destroyed, the lienholders admittedly
            had compensable property.  Immediately afterwards, they had none. This was not
20          because their property vanished into thin air.  It was because the Government for
            its own advantage destroyed the value of the liens, something that the
21          Government could do because its property was not subject to suit, but which no
            private purchaser could have done.  Since this acquisition was for a public use,
22          however accomplished, whether with an intent and purpose of extinguishing the
            liens or not, the Government's action did destroy them and in the circumstances
23          of this case did thereby take the property value of those liens within the meaning
            of the Fifth Amendment.

24

*Armstrong v. United States*, 364 U.S. 40, 46–49 (1960) (holding that the inability of a subcontractor to enforce an otherwise valid materialmen's lien under state law against the United States after the United States acquired title to certain boats from the general contractor under a contractual default clause resulted in a compensable taking).  Here, the value transferred from US Bank to SFR via the destruction of US Bank's lien was not for any public use, but the Supreme Court has also noted that the transfer of the value of a lien from a private creditor to a private debtor might be a Fifth Amendment taking, because the Fifth Amendment prohibits the government from taking private property for a non-public use regardless of whether it pays just compensation and regardless of whether it immediately transfers the value of the thing taken to a third party. *See United States v. Sec. Indus. Bank*, 495 U.S. 70, 76–78 (1982).  Ultimately, however, the Court interpreted the bankruptcy provision at issue to operate only prospectively in order to avoid the potential constitutional problem, so the discussion on the Takings Clause in that case would appear to be dicta. *See id.* at 78–82.  US Bank is correct that the Supreme Court has directly ruled that a federal statute may not take the interest of a mortgagee and give it to a mortgagor without effecting a taking. *See Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555, 601–02 (1935) (holding that a federal law permitting a farm mortgagor to force a sale to himself from the mortgagee at the current assessed value unlawfully took the property of the mortgagee).  But that isn't what US Bank alleges happened here.  Here, a junior lienor has lost his interest via a senior lienor's foreclosure sale at a price leaving nothing for the junior lienor.  There may or may not be legitimate issues of due process or commercial reasonableness, but the loss of a junior lienor's interest via the sale of an undersecured property is a common result.

The Court is compelled to reject the takings argument in this case.  The destruction of an undersecured junior lien via the foreclosure of a senior lien under priority rules published before

the junior lienor took his lien has never been held to implicate the Takings Clause to this Court's

knowledge.  The Court has searched for such a case to no avail, and US Bank has cited to none.

The announcement by the Nevada Supreme Court of its interpretation of NRS 116.3116's

priority rules that were at best previously unclear and at worst previously to the contrary raises

colorable arguments under the Contract Clause, the Ex Post Facto Clause, the substantive due

process component of the Due Process Clause, and perhaps the "synergy" between the rights

against retroactive lawmaking and the fundamental right to property emanating from those

clauses. *Cf. Obergefell*, 2015 WL 2473451, at *17.  That is, the federal fundamental rights

against a state's use of retroactive laws and the deprivation of property without due process may

indeed protect a lienholder from the application of a state judicial opinion applying lien priority

rules in a way that a reasonable lienholder would not have anticipated under the state of the law

when he gave his lien.  US Bank may amend the Complaint to plead those issues if it wishes and

may attack any amended complaint on those bases, but the Court perceives no takings problem.

### 4.      Commercial Unreasonableness of the Sale

>    In addition to giving reasonable notice, a secured party must, after default,
> proceed in a commercially reasonable manner to dispose of collateral.  Every
> aspect of the disposition, including the method, manner, time, place, and terms,
> must be commercially reasonable.  Although the price obtained at the sale is not
> the sole determinative factor, nevertheless, it is one of the relevant factors in
> determining whether the sale was commercially reasonable.  A wide discrepancy
> between the sale price and the value of the collateral compels close scrutiny into
> the commercial reasonableness of the sale.

*Levers v. Rio King Land & Inv. Co.*, 560 P.2d 917, 919–20 (Nev. 1977) (citations omitted).

Under the facts of the case as pled, US Bank would survive a motion to dismiss on its own claim

for a declaratory judgment that the sale in this case was commercially unreasonable.  But US

Bank is not entitled to dismissal of SFR's Counterclaim for a declaration that it was not.

Whether the sale here was commercially reasonable is a question of fact for summary judgment

or trial.  The Court will not rule purely on the (albeit undisputed) "wide discrepancy between the sale price and the value of the collateral" because the Court (or a jury) must consider any competent evidence proffered as to other relevant factors.  There could be some factual circumstance accounting for the extremely low sale price that alleviates the concerns of commercial unreasonableness created thereby.  There is currently no evidence before the Court under which the Court could transform the present motion into one for summary judgment.

### 5.      Notice Under the Due Process Clause

US Bank argues that because the statutes do not require junior lienors to be given notice of an impending HOA foreclosure sale that might extinguish their liens, junior lienors in such circumstances are deprived of the fundamental right to notice protected by the Due Process Clause of the Fourteenth Amendment.  The Court finds that the statutes do not provide sufficient process but grants the motion based on the Due Process Clause of the Fifth Amendment, not based on the Due Process Clause of the Fourteenth Amendment.

"An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950).  The *Mullane* Court ruled that under this standard notice by publication of an action to settle the accounts of a common trust fund was constitutionally insufficient to inform those beneficiaries whose names and addresses were known. *Id.* at 315; *see also, e.g.*, *Walker v. City of Hutchinson*, 352 U.S. 112 (1956) (ruling that publication was insufficient under the Due Process Clause to provide reasonable notice of condemnation proceedings to a landowner whose name was known).  Likewise, a governmental body conducting a tax sale must provide notice to junior lienors under

1   the standards of *Mullane*. *Mennonite Bd. of Missions v. Adams*, 462 U.S. 791, 798 (1983).  An

2   HOA foreclosure sale under NRS 116.3116 can be seen to be analogous to the tax sale in

3   *Mennonite Board of Missions* by simply inserting "HOA" for "tax" in the relevant passage:

4       [A] mortgagee possesses a substantial property interest that is significantly
        affected by a[n HOA] sale.  Under [Nevada] law, a mortgagee acquires a lien on
5       the owner's property . . . .  A mortgagee's security interest generally has priority
        over subsequent claims or liens attaching to the property, and a purchase money
6       mortgage takes precedence over virtually all other claims or liens including those
        which antedate the execution of the mortgage.  The [HOA] sale immediately and
7       drastically diminishes the value of this security interest by granting the [HOA]-
        sale purchaser a lien with priority over that of all other creditors.  Ultimately, the
8       [HOA] sale may result in the complete nullification of the mortgagee's interest,
        since the purchaser acquires title free of all liens and other encumbrances . . . .

9

10          . . . .

11          Neither notice by publication and posting, nor mailed notice to the
        property owner, are means "such as one desirous of actually informing the
12      [mortgagee] might reasonably adopt to accomplish it."  Because they are designed
        primarily to attract prospective purchasers to the tax sale, publication and posting
13      are unlikely to reach those who, although they have an interest in the property, do
        not make special efforts to keep abreast of such notices.  Notice to the property
14      owner, who is not in privity with his creditor and who has failed to take steps
        necessary to preserve his own property interest, also cannot be expected to lead to
15      actual notice to the mortgagee.  The County's use of these less reliable forms of
        notice is not reasonable where, as here, "an inexpensive and efficient mechanism
16      such as mail service is available."

17          Personal service or mailed notice is required even though sophisticated
        creditors have means at their disposal to discover whether [HOA dues] have not
18      been paid and whether [HOA] sale proceedings are therefore likely to be initiated.
        In the first place, a mortgage need not involve a complex commercial transaction
19      among knowledgeable parties, and it may well be the least sophisticated creditor
        whose security interest is threatened by a tax sale.  More importantly, a party's
20      ability to take steps to safeguard its interests does not relieve the State of its
        constitutional obligation.

21  *Id.* at 798–99 (citations omitted).  *Mennonite Board of Missions* makes clear that junior lienors

22  must be given notice via personal service or mail (or perhaps via some other constitutionally

23

24

reasonable method) where they stand to lose a security interest in a property via a tax sale, and that publication alone is not constitutionally sufficient.

There is, of course, a critical distinction between *Mennonite Board of Missions* and the present case. Notice under the Due Process Clause is only a requirement as to government action, because the Fourteenth Amendment does not govern private action. *Civil Rights Cases*, 109 U.S. 3, 10–11 (1883). A government conducting a tax sale to execute upon its own lien is clearly subject to *Mullane*, but a homeowner's association is not necessarily an arm of the government simply because it conducts a non-judicial sale under state law.

When a state permits a private actor to use the machinery of government to deprive another private actor of his constitutional rights, the first actor may in some cases be treated as a state actor for the purposes of the Fourteenth Amendment. In *Shelley v. Kraemer*, 334 U.S. 1 (1948), the Supreme Court ruled that the judicial enforcement of a racially restrictive covenant by a homeowner's association constituted state action. The Court first noted that the Equal Protection Clause of the Fourteenth Amendment spoke to the constitutional issue of race discrimination. *See id.* at 10. Similarly here, the Due Process Clause of the Fifth Amendment speaks to the constitutional issue of notice. Second, the Court noted that the private rule at issue would have been unconstitutional under its precedents if a government actor were to have enforced an identical rule. *See id.* at 11. Likewise here. *See Mennonite Bd. of Missions*, 462 U.S. at 798–99. Third, the Court noted that in the case before it, as here, the rule had not been imposed by a state or municipal legislature, but by a private homeowner's association. *See Shelley*, 334 U.S. at 12–13. Likewise here. The Court ruled that "the restrictive agreements standing alone cannot be regarded as a violation of any rights guaranteed . . . by the Fourteenth Amendment. . . . But here there was more." *Id.* at 13. That "something more" was the judicial

enforcement of the restrictions. *See id.* at 13–14.  The same is true here as to SFR's Counterclaim; although SFR does not seek judicial foreclosure, it does ask the Court to issue an order declaring the validity of the non-judicial foreclosure under the relevant state statutes.  A plain reading of *Shelley* would therefore lead the Court to apply it against the Counterclaim in this case, although the Due Process Clause of the Fifth Amendment would apply, as opposed to the Due Process Clause of the Fourteenth Amendment, because SFR asks a federal court to enforce the challenged laws, so it is the present federal judicial action that is the source of the government action under the theory of *Shelley*, not the non-judicial foreclosure under state law itself.

The Court of Appeals has ruled that a state's creation of non-judicial foreclosure statutes alone does not sufficiently involve a state in a non-judicial foreclosure to implicate state action unless some state actor such as a sheriff or court clerk has some direct involvement in the sale, which is not alleged here. *See Apao v. Bank of N.Y.*, 324 F.3d 1091, 1093–94 (9th Cir. 2003); *Charmicor v. Deanor*, 572 F.2d 694, 695–96 (9th Cir. 1978).  But the present situation is distinguishable from *Apao* in a way essential to the rule of *Shelley*, at least as to the Counterclaim.

In *Apao*, the mortgagor herself had brought the action against the foreclosing mortgagee after the foreclosure sale. *See Apao*, 324 F.3d at 1092.  There, neither the mortgagee nor any other party sought a judicial declaration of the validity of the foreclosure sale as against the mortgagor, so no party had invoked the power of the United States (or any state) to enforce the relevant statutes against the mortgagor.  To the contrary, it was the complaining mortgagor who had attempted to invoke the judicial power of the United States to void the sale. *See id.*  There was therefore no *Shelley* problem in *Apao* because the district court was not being asked to

enforce a constitutionally problematic statute via judicial foreclosure or to declare the validity of a non-judicial foreclosure, but rather to void a completed non-judicial foreclosure.  The same is true of US Bank's quiet title claim here.  Although US Bank is a junior lienor and not a mortgagor, it is similarly situated to the mortgagor in *Apao* for the purposes of the rule of *Shelley*.  As in *Apao*, US Bank's own quiet title claim cannot implicate state action under the rule of *Shelley*, because it is US Bank itself, not SFR, who asks the Court to adjudicate the validity of the potentially constitutionally problematic statutes.  For reasons of standing, ripeness, estoppel, waiver, equity, and probably several other jurisprudential doctrines, US Bank cannot complain of the threat of impending judicial action that it has itself demanded.  It therefore cannot invoke the rule of *Shelley* to turn this Court's impending ruling on its own quiet title claim into government action against it.  Otherwise, the rule of *Shelley* could be combined with a declaratory judgment action by any plaintiff to avoid the state-action requirement under the Fifth or Fourteenth Amendments.  That is, a plaintiff could convert any private action into state action simply by asking a court to declare that the private action would be unconstitutional if it had been state action.  The rule of *Shelley* is not so broad.  US Bank's only purchase onto due process standards in the context of its own claims is an argument that some state or local government violated the Fourteenth Amendment via its direct involvement in the foreclosure sale.

The result is different with respect to SFR's Counterclaim, however.  In the context of SFR's Counterclaim, US Bank may under the rule of *Shelley* invoke the Fifth Amendment against this Court's potential declaration that SFR owns the Property free and clear of US Bank's interest based on SFR's compliance with certain state statutes governing the notice process if those statutes do not comport with due process.  As to SFR's Counterclaim, SFR has invoked the power of the Court to enforce potentially constitutionally problematic state statutes against US

Bank just as the neighboring homeowners in *Shelley* sought to invoke the power of the state

courts to enforce the constitutionally problematic covenants against the Shelleys. *See Shelley*,

334 U.S. at 6.  Because this Court's enforcement of the state statutes via a declaration in

accordance with the Counterclaim would constitute government action under the Fifth

Amendment, *see id.* at 14–15 & n.14 (collecting cases), the Court must address the underlying

due process issue in determining the motion to dismiss the Counterclaim, regardless of whether

the non-judicial foreclosure action itself constituted state action under the Fourteenth

Amendment.

   With respect to notifying US Bank of the sale, SFR plausibly alleges only having

complied with the statutes, not having gone beyond them, except as a possibility. (*See* Countercl.

¶ 9, ECF No. 25 ("As recited in the Association Foreclosure Deed, the Association foreclosure

sale complied with all requirements of law, including but not limited to, recording and mailing of

copies of Notice of Delinquent Assessments and Notice of Default, and the recording, posting

and publication of the Notice of Sale.")).  Nevada's statutes governing which parties must

receive notices of default ("NOD") and NOSs in HOA foreclosures are complex.  First, NRS

116.31162 governs notice of a NDAL and NOD to unit owners. *See* Nev. Rev. Stat. § 116.31162.

That statute is not implicated here.  Second, NRS 116.31163 requires notice of a NOD by first

class mail within 10 days of recordation of the NOD to: (1) those who have requested notice

under NRS 116.31168 or 107.090; (2) any holder of a recorded security interest who has notified

the foreclosing HOA 30 days prior to the recordation of the NOD of the existence of its security

interest; and (3) certain purchasers of the unit. *See id.* § 116.31163.  As to lienors of record like

US Bank, NRS 116.31163 therefore operates as an opt-in system requiring affirmative action by

the lienor of record to obtain notice of a NOD with respect to an HOA sale.  Third, NRS

116.311635 requires notice of a NOS by certified or registered mail, return receipt requested, to: (1) the owner; (2) those entitled to notice of the NOD under NRS 116.31163, i.e., those who have opted in under that section; (3) certain purchasers and any holder of a recorded security interest who has notified the foreclosing HOA of the existence of its security interest prior to the mailing of the NOS; and (4) the Ombudsman for Owners in Common-Interest Communities and Condominium Hotels. *See id.* § 116.311635. As to lienors of record like US Bank, NRS 116.311635 therefore also operates as an opt-in system requiring affirmative action by the lienor of record to obtain notice of a NOS with respect to an HOA sale. Fourth, NRS 116.31168 states, "The provisions of NRS 107.090 apply to the foreclosure of an association's lien as if a deed of trust were being foreclosed. The request must identify the lien by stating the names of the unit's owner and the common-interest community." *Id.* § 116.31168. NRS 107.090 defines a "person with an interest" as including lienors of record, *see id.* § 107.090(1), notes that such persons may request copies of a NOD and NOS by recording such a request, *see id.* § 107.090(2), and requires notice by certified or registered mail, return receipt requested of both the NOD and NOS to anyone who has requested such notice under NRS 107.090(2) *and any junior lienor of record*, *see id.* § 107.090(3)–(4).

NRS 116.31168's incorporation of NRS 107.090 would therefore appear to prevent a facial due process attack on the notice procedures governing HOA sales in Nevada, despite the opt-in provisions of NRS 116.31163 and 116.311635.[3] US Bank could still rely on its allegations that it did not in fact receive constitutionally sufficient notice in this case even if the

---

3 Those opt-in provisions are not rendered superfluous by NRS 116.31168's incorporation of NRS 107.090, because they permit opt-in notice for a broader category of lienors than the category of lienors to whom NRS 107.090 requires automatic notice. NRS 107.090 requires notice only for junior lienors of record, but NRS 116.31163 and 116.311635 permit opt-in notice for any lienor of record.

1   statutes required it.  But the Court finds that the statutes did not in fact require mailed notice to

2   US Bank of the NOD or the NOS.  There is an ambiguity in NRS 116.31168 that the Nevada

3   Legislature has recently clarified by amending the statute.  NRS 116.31168's first sentence read

4   alone appears to incorporate NRS 107.090 en toto. *See id.* § 116.31168(1) ("The provisions of

5   NRS 107.090 apply to the foreclosure of an association's lien as if a deed of trust were being

6   foreclosed.").  But its second sentence makes it appear as if the Nevada Legislature may have

7   intended to incorporate only the opt-in provision under NRS 107.090(2). *See id.* ("*The request*

8   *must identify the lien by stating the names of the unit's owner and the common-interest*

9   *community.*" (emphasis added)).  A recent amendment to NRS 116.31168 completely amends

10  that section, removing any mention of NRS 107.090 and making clear that the opt-in procedure

11  applies to both NODs and NOSs. *See* S.B. 306 § 7, 2015 Leg., 78th Sess. (Nev. 2015).

12  Contemporaneous amendments to NRS 116.31163 and 116.311635 applicable to foreclosures

13  where the NOD or NOS are recorded on or after October 1, 2015, respectively, requires certified

14  mail of a copy of both the NOD and the NOS to all lienors of record whose liens were recorded

15  prior to the recordation of the NOD or the mailing of the NOS, respectively. *See id.* §§ 3–4, 9(1).

16  These latter amendments probably avoid any facial due process notice issues going forward, but

17  the very need for these amendments indicates that the Nevada Legislature perceived that the

18  statutes previously did not require such notice, i.e., that NRS 116.31168 did not incorporate NRS

19  107.090(3)–(4).

20          The Nevada Supreme Court itself has noted that the Nevada Legislature had declined to

21  adopt the Uniform Common Interest Ownership Act's ("UCIOA")  recommendation of

22  "reasonable notice . . . to all lien holders of the unit whose interest would be affected," UCIOA

23  3-116(j)(4), in favor of its own particularized notice provisions under Chapter 116. *see SFR Invs.*

24

*Pool 1*, 334 P.3d at 411.  Critically, although the Nevada Supreme Court noted that NRS 107.090 is incorporated by section 116.31168(1), in the very same paragraph, and even when specifically citing to NRS 107.090(3)(b) and (4) (the provisions requiring mailed notice of NODs and NOSs to junior lienors of record in deed of trust foreclosures), the Court concluded that notice to a lienor of record requires the lienor to have notified the HOA of the interest before the recordation of the NOD or mailing of the NOS under NRS 116.31163 and 116.311635, respectively.  *See id.* This shows that the Nevada Supreme Court either reads NRS 116.31168 not to incorporate the automatic notice provisions of NRS 107.090(3)–(4) or that it reads the opt-in provisions of NRS 116.31163 and 116.311635 to supersede NRS 107.090(3)–(4)'s automatic notice provisions as to HOA foreclosures even if NRS 107.090 is otherwise incorporated into Chapter 116 foreclosures generally via NRS 116.31168.

The question then is whether notice only by publication of the time and place of sale is constitutionally reasonable.  The Court is compelled to find that it is not.  "Notice by mail or other means as certain to ensure actual notice is a minimum constitutional precondition to *a proceeding which will adversely affect the liberty or property interests* of *any* party, whether unlettered or well versed in commercial practice, if its name and address are reasonably ascertainable." *Mennonite Board of Missions*, 462 U.S. at 800 (first emphasis added).  US Bank's security interest in the Property was not adversely affected by the declaration or notice of default but by the sale itself.  That is the event that foreclosed the right of redemption and vested title in SFR free of US Bank's lien, *see* Nev. Rev. Stat. § 116.31166(3), and that is therefore the event of which US Bank was constitutionally entitled to reasonable notice, *see Mullane*, 339 U.S. at 314 ("An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise

1    interested parties of the pendency of the action and afford them an opportunity to present their

2    objections.").  Notice is constitutionally reasonable when it is attempted in a manner such as a

3    person who actually wants the recipient to receive notice might attempt it:

4            [W]hen notice is a person's due, process which is a mere gesture is not due
             process.  The means employed must be such as one desirous of actually informing
5            the absentee might reasonably adopt to accomplish it.  The reasonableness and
             hence the constitutional validity of any chosen method may be defended on the
6            ground that it is in itself reasonably certain to inform those affected . . ., or, where
             conditions do not reasonably permit such notice, that the form chosen is not
7            substantially less likely to bring home notice than other of the feasible and
             customary substitutes.

8    *Id.* at 315 (citations omitted).

9            Where US Bank's identity and address were readily obtainable—an issue that is not

10   genuinely disputed—publication alone of the NOS was not a means such as one actually desirous

11   of informing US Bank of the sale might reasonably have adopted.  It is not constitutionally

12   reasonable to require an interested party to monitor the public records for a NOS or to

13   proactively request notice of a potential future NOS.  The constitutional standard is whether the

14   person giving the notification made reasonable efforts to apprise the interested party of the

15   proceeding under all the circumstances as if he actually wanted to notify him.  That standard is

16   not satisfied by the statutes at issue here.  A person actually desirous of informing an interested

17   party of a foreclosure sale would not rely on publication alone where the interested party's

18   address is readily obtainable or even obtainable with some reasonable amount of effort.  The

19   duty cannot be shifted to an interested party to actively request notice of a potential event

20   beforehand where the event is of a type that the interested party would obviously want notice.  A

21   person actually desirous of informing another person of an impending foreclosure sale would not

22   gamble with mere publication or provide notice only if requested beforehand.  Merely recording

23   a notice of sale in the public records and posting it near the courthouse steps where active effort

24

is required to discover it rather than mailing the interested party a copy of the notice at his easily obtainable address is not constitutionally reasonable. *Mennonite Bd. of Missions*, 462 U.S. at 798–99.

In summary, the relevant statutes do not satisfy due process where a sale can be characterized as government action.  SFR's Counterclaim for a declaration by this Court of the extinguishment of US Bank's interest via the HOA foreclosure sale implicates government action under the rule of *Shelley* and the Due Process Clause of the Fifth Amendment.  The Court therefore dismisses SFR's Counterclaim, with leave to amend.  If SFR can affirmatively allege that it or its agent gave US Bank constitutionally sufficient notice, i.e., personal or mailed notice, the Counterclaim should be permitted to proceed to summary judgment.  As the Court has explained, *supra*, US Bank's own quiet title claim cannot succeed on the due process issue without a showing of state action in the non-judicial foreclosure sale itself, but that issue is not now before the Court.

### C.       The Motion for a Preliminary Injunction

US Bank asks the Court to enjoin Siena HOA's sale of the Property.  As noted, *supra*, there is a ripe controversy over the superpriority amount of the lien because Siena HOA and its agents intend to sell the Property, and the sale of the Property under state law will destroy US Bank's lien unless US Bank tenders the superpriority amount of the lien before the sale.  Siena HOA and its agents, however, refuse to identify the superpriority amount, such that US Bank must satisfy the entire HOA lien to avoid the sale, and much, if not most, of that amount is not in fact in priority to US Bank's lien.  Also, US Bank argues that D'Andrea HOA's 2013 HOA sale itself did not extinguish US Bank's lien because US Bank tendered the superpriority amount to D'Andrea HOA's agent, Alessi, before the sale.

US Bank has not shown via competent evidence that it has a reasonable probability of success on its quiet title claim against D'Andrea HOA because it adduces no affidavit, declaration, or other evidence tending to show that it in fact tendered or attempted to tender the superpriority amount to D'Andrea HOA, Alessi, or any other entity before D'Andrea HOA's 2013 HOA sale. US Bank has however shown a reasonable probability of success on its declaratory judgment claim against Siena HOA and Clarkson. US Bank has adduced three exhibits to its motion: (1) the September 2014 NDAL filed by Clarkson on behalf of Siena HOA indicating that SFR was delinquent on its assessments to Siena HOA in the amount of $4,590.68; (2) the NOD recorded contemporaneously with the NDAL; and (3) the March 2015 Escrow Demand sent from Clarkson to US Bank's counsel indicating that $3292.18 would be required to stop the foreclosure, with no explicit indication of the superpriority amount. The Escrow Demand contains an itemization indicating seven unpaid assessment fees totaling $430 and no charges for maintenance of the exterior of the Property or abatement of nuisances therefrom, which are the only three kinds of charges giving rise to the superpriority portion of an HOA lien. *See* Nev. Rev. Stat. §§ 116.3116(2) (final unnumbered paragraph); *id.* § 116.310312. The exact amount of the superpriority lien is not important in the present context. The point is that US Bank has shown that the superpriority amount can be readily calculated but that Siena HOA and Clarkson refuse to confirm the amount. Because US Bank seeks a declaration of the amount, it has shown that it is reasonably likely to succeed on the merits of its declaratory judgment claim.

A likelihood of irreparable harm has also been shown. If US Bank were to tender $430 (or whatever the superpriority amount is) and the purchaser at Siena HOA's sale were to deny that the full superpriority amount had been paid, US Bank could irretrievably lose its security interest in the Property.

1     The equities tip sharply in US Bank's favor.  It stands to lose a security interest in real
2  property on the order of hundreds of thousands of dollars, depending on the sale price.  Even if
3  the Property is undersecured (which is unknown), Siena HOA stands to lose only the subpriority
4  amount of its lien, which is no more than a few thousand dollars.  Clarkson stands to lose
5  nothing.  It has no direct interest in the Property, and its right to payment from Siena HOA for
6  collection services will not be affected by the sale or non-sale of the Property.
7     The public interest also favors a preliminary injunction.  As the present controversy
8  between US Bank and D'Andrea HOA illustrates, a second sale by Siena HOA without a prior
9  judicial declaration of the superpriority amount would further cloud the title to the Property and
10 cause additional litigation over whether US Bank's lien had been extinguished.  Not only would
11 that cause needless litigation as to the Property at issue here, but the aggregate effect of hundreds
12 or thousands of similar controversies could have a significant effect on the real estate market in
13 this state by reducing the inventory available to homebuyers due to clouded titles of homes
14 previously sold at HOA sales, thereby artificially increasing the prices homebuyers must pay.  It
15 is better to prevent the sale until the Court can declare the superpriority amount, so that US Bank
16 may pay it before a sale and avoid the additional controversy.
17    In order to both minimize any delay of a sale and avoid the additional controversy that
18 would arise from a sale before a declaration of the superpriority amount, the Court will
19 consolidate a hearing on the preliminary injunction motion with a trial on the merits (as to the
20 second cause of action only) under Rule 65(a)(2).  The Court need not enjoin a sale at this time.
21 There is no indication of a NOS having been recorded.  If Siena HOA records a NOS in the
22 interim, US Bank may ask the Court to enjoin the sale until after trial.
23 ///
24

1

**CONCLUSION**

2          IT IS HEREBY ORDERED that the Motions to Dismiss (ECF Nos. 24, 27) are DENIED.

3          IT IS FURTHER ORDERED that the Motion to Dismiss (ECF No. 42) is GRANTED,

4    with leave to amend.

5          IT IS FURTHER ORDERED that the Motion for a Preliminary Injunction (ECF No. 46)

6    is CONSOLIDATED WITH A TRIAL ON THE MERITS.  Siena HOA's answer is due within

7    **seven (7)** days of the entry of this Order into the electronic docket.  The parties shall contact the

8    Court as to a mutually agreeable time for trial, whether Siena HOA or Clarkson intend to

9    demand a jury trial (US Bank appears to have made no timely jury demand), and the expected

10   length of the trial.  The trial will concern the single question of the superpriority amount of Siena

11   HOA's lien against the Property under NRS 116.3116.

12         IT IS SO ORDERED.

13   Dated this 26th day of August, 2015.

14

15   _____

16                    ROBERT C. JONES
                 United States District Judge

17

18

19

20

21

22

23

24